[relates to Docket Item #9]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JULIANA EYO, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | CIVIL NO. 06-6185 |
| UNITED STATES OF AMERICA, | **OPINION** |
| Defendant. | |

APPEARANCES:

W. Robb Graham, Esq.
504 Route 130 North, Suite 4
Cinnaminson, New Jersey 08077
    Attorney for Plaintiff

Christopher J. Christie
United States Attorney
    By: Paul A. Blaine, Esq.
        Assistant United States Attorney
401 Market Street
P.O. Box 2098
Camden, New Jersey 08101
    Attorney for Defendant


**Simandle, District Judge**:

**I. Introduction**

This matter comes before the Court upon the motion of defendant, the United States of America, for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) to dismiss plaintiff Juliana Eyo's ("Eyo") claims under the Federal Tort

Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq.  Eyo filed suit on December 12, 2006, alleging false arrest and negligence by employees of the United States Postal Service ("USPS") acting within the scope of their employment and arising out of the events on or about November 14, 2005, which caused Eyo to be arrested and detained by the Burlington City Police Department ("BCPD").  The Government claims it is entitled to summary judgment based on (1) an express exception to the FTCA retaining sovereign immunity for claims arising out of false arrest and misrepresentation, and (2) statutory immunity granted to financial institutions for reporting possible violations of law under the Annunzio-Wylie Anti-Money Laundering Act, codified at 31 U.S.C. § 5311, et seq.  For the reasons set forth below, this Court shall grant this motion for summary judgment under the immunity provisions of the Annunzio-Wylie Anti-Money Laundering Act, pursuant to 31 U.S.C. § 5318(g)(3)(A).

**II. Background**

For purposes of adjudicating this summary judgment motion[1],

---

[1] The Court notes that neither party has complied with the requirements of L. Civ. R. 56.1, which provides: "On motions for summary judgment, each side shall furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue . . . ."  Although the Defendant's Brief contains a factual narrative, accompanied by a declaration of Jeffrey A. Sims and relevant documentary evidence, it does not set forth the facts in a statement containing numbered paragraphs to which the Plaintiff must respond.  Similarly, the Plaintiff's Brief alludes to various facts and is accompanied by Plaintiff's Affidavit, but does not state any specific agreement or disagreement with the

the facts are viewed in the light most favorable to the Plaintiff, and all reasonable inferences are drawn in favor of the Plaintiff as the non-moving party.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Eyo has been a resident of the United States since 1980, during which time she became a certified nurse's assistant and has never been arrested or convicted of any crime prior to November 14, 2005.  (Eyo Aff., Pl.'s Ex. 1, ¶¶ 3-4.)  On November 14, 2005[2], Eyo attempted to cash two genuine USPS money orders in the amounts of three hundred dollars ($300.00) and one thousand dollars ($1,000.00) at the Burlington City Post Office.  Eyo's cousin, Oladuti Ojo, had previously purchased the money orders at the post office in Lutherville, Maryland (Sims Decl., ¶ 6; Def.'s Ex. A, at 26) to help Eyo pay for her travel to attend her son's wedding in Nigeria (Eyo Aff., Pl.'s Ex. 1, ¶ 5; Sims Decl., ¶ 4; Def.'s Ex. A, at 26).  Eyo attempted to cash those money orders on November 14, 2005 to pay for an airline ticket for a flight to Nigeria that same night (Sims Decl., ¶ 4).  What followed was a

---

facts that have been narrated by Defendant.  The Court has carefully reviewed all facts brought to its attention by either party in this motion, and the background facts recited herein are not in dispute.

[2] The date of the actions in dispute is provided as November 15, 2005 in Plaintiff's Complaint [Docket No. 1] and Defendant's Motion [Docket No. 9], but later provided as November 14, 2005 in Plaintiff's Response [Docket No. 10] and Exhibit to Plaintiff's Response [Docket No. 12].  For purposes of this Opinion, the specific date is irrelevant.

series of unfortunate misunderstandings by employees of the USPS.

Eyo produced the money orders to USPS postal clerk Dominic Scardetto ("Scardetto") (Def.'s Ex. A, at 10). Because of the amounts of the money orders, Scardetto brought the money orders to his supervisor Priscilla Moore ("Moore") for approval, at which point he mistakenly thought the markings on the money orders looked unusual and questioned the genuineness of the money orders. (Scardetto Decl., Def.'s Ex. A, at 10.) While waiting, Eyo stated that she intended to travel out of the area soon. (Leonard S. Decl., Def's Ex. A, at 9; Scardetto Decl., Def.'s Ex. A, at 10-11.) The USPS and the Burlington City Post Office in particular had recently experienced problems negotiating fraudulent money orders in scams that notably involved persons from Nigeria. (Sims Decl., ¶ 3; Sims Decl., at 6-7; Toombs Decl., Def's Ex. A, at 12.)

As Eyo waited, Moore and Postmaster Daryl Toombs ("Toombs"), attempted to determine the legitimacy of the money orders with the assistance of United States Postal Inspector Dean Vitalli ("Inspector Vitalli"), whom they called on the phone. (Toombs Decl., Def.'s Ex. A, at 12.) Following Inspector Vitalli's instructions, Toombs held the money order "down away from light" and informed Inspector Vitalli that he did not observe the watermark security feature. (Id.) Inspector Vitalli told Toombs over the phone that the money orders were counterfeit and

instructed Toombs to notify the police. (Id.) In addition, Moore called the post office in Cockeysville, Maryland (Def.'s Ex. A, at 26), which denied issuing the money orders.[3] (Sims Decl., ¶¶ 2, 8.) In actuality, the money orders were genuine and had been issued by the post office in Lutherville, Maryland. (Sims Decl., ¶ 6.) Though Eyo provided proper identification, was not under the influence of alcohol or drugs (Eyo Aff., Pl.'s Ex. 1, ¶ 9-10), and produced validly negotiable instruments, the USPS refused to cash Eyo's money orders and deliberately stalled her until the police arrived (Scardetto Decl., Def.'s Ex. A, at 11).

Police officers from the BCPD arrived and questioned Eyo (id.; Toombs Decl., Def.'s Ex. A, at 12; Leonard S. Decl., Def's Ex. A, at 9) before taking her to the BCPD, where she was interviewed by BCPD Detective William E. Hunt III ("Detective Hunt") and United States Postal Inspector Jeffrey Sims ("Inspector Sims") (Sims Decl., ¶¶ 3-4). Following that interview, and upon Inspector Sims's advice that the money orders had been identified as fraudulent, Detective Hunt prepared and filed a criminal complaint against Eyo, upon which the Burlington City Municipal Court issued a warrant for Eyo's arrest. (Id., ¶

---

[3] The record is unclear as to whether Moore called the post office in Cockeysville, Maryland before or after the phone conversation with Inspector Vitalli. For purposes of this motion for summary judgment, the chronology is irrelevant.

5; Def.'s Ex. A, at 6.)

Eyo was only released after her sister contacted the post office that actually issued the money orders in Lutherville, Maryland, which confirmed they were genuine. (Eyo Aff., Pl.'s Ex. 1, ¶ 13; Sims Decl., ¶ 6.)

Eyo alleges that USPS Inspectors Vitalli and Sims, acting within the scope of their employment, negligently failed to determine that the disputed money orders were genuine. Eyo also alleges that Inspectors Vitalli and Sims, acting within the scope of their employment, knowingly, intentionally, and improperly caused Eyo to be falsely arrested and detained by the BCPD without properly attempting to determine whether the money orders were genuine.

In accordance with 28 U.S.C. § 2675(a), as a prerequisite to instituting her claim against the Government under the FTCA, Eyo timely submitted Administrative Claims to the USPS, which were denied.[4] (Compl., p.2.)

## III. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and

---

[4] Plaintiff has failed to provide evidence of the denial by the USPS of her administrative claim, but because the Government does not dispute the point, for purposes of this Opinion, it is assumed that Plaintiff has satisfied this prerequisite.

that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 26(c); see Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir. 1983). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rules of law. Id. Thus, disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the nonmoving party by extending any reasonable favorable inference to that party. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080-81 (3d Cir. 1996). "[T]he nonmoving party's evidence 'is to be believed, and justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Brewer v. Quaker State Oil Refining Corp., 72 F.2d 326, 329-330 (3d Cir. 1995) (quoting Liberty Lobby, 477 U.S. at 248).

The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of

7

which party ultimately would have the burden of persuasion at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' -- that is, point out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Id. at 325. The nonmoving party "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue. Fed. R. Civ. P. 56(e). They must do more than rely only "upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985), cert. denied, 474 U.S. 1010 (1985) (citation omitted).

Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the nonmovant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. Liberty Lobby, 477 U.S. at 249-50. Similarly, to survive summary judgment Plaintiff must produce more than reassertions of "factually unsupported allegations" contained in her pleadings. Id. Furthermore, even if this Court found that defendant, as the

8

moving party, met its initial burden, summary judgment would have to be denied if plaintiff can produce evidence that could reasonably be the basis for a finder of fact's determination in her favor.

In this case, Plaintiff as the nonmoving party submits as evidence only her own affidavit, while presumably relying on the substance of the claims in her pleadings.  Although Plaintiff asserts "[t]he facts of this matter are slightly different than represented by the [USPS]" (Pl.'s Response, at 1), she does not specify which facts she disputes and offers no evidence to contradict the facts as given through witness statements provided by the Government.  Nonetheless, Plaintiff, as the nonmoving party, is entitled to the benefit of any reasonable inferences flowing from any admissible evidence contained in her affidavit, as well as any factual ambiguities created by the evidence submitted by Defendant in support of its motion under Rule 56(c).

**B. Governmental Immunity Under the FTCA**

The Federal Tort Claims Act ("FTCA") does not itself create a substantive cause of action against the Government; rather, it provides a mechanism by which a state tort action may be brought against the Government in federal court.  <u>In re Orthopedic Bone Screw Prod. Liab. Litig.</u>, 264 F.3d 344, 362 (3d Cir. 2001).  More specifically, the FTCA grants district courts jurisdiction over:

>  civil actions on claims against the United
>  States, for money damages, accruing on and

>after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). Thus, the FTCA "waives the government's sovereign immunity with respect to tort claims against the United States for money damages." Fisher Bros. Sales, Inc. v. United States, 46 F.3d 279, 284 (3d Cir. 1985). The government's waiver of its sovereign immunity, though, must be construed narrowly. In re Orthopedic Bone Screw Prod. Liab. Litig., 264 F.3d at 362.

The FTCA's waiver of government immunity is limited by several exceptions, one of which the Government claims is applicable in this case. Title 28 U.S.C. § 2680 reads, in relevant part, that:

>The provisions of this chapter and section 1346(b) of this title shall not apply to-
>   (h) Any claim arising out of . . . false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: Provided, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the [FTCA] shall apply to any claim arising . . . out of . . . false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer

10

>     of the United States who is empowered by
>     law to execute searches, to seize
>     evidence, or to make arrests for
>     violations of Federal law.

28 U.S.C. § 2680(h).  Pursuant to this provision, the Government has retained its sovereign immunity from suit for claims of false arrest arising under state tort law unless the tortious act was performed by a federal investigative or law enforcement officer. Id.; see Biase v. Kaplan, 852 F. Supp. 268, 281 (D.N.J. 1994).

Conduct by the USPS and its employees are included within the terms of the FTCA.  Under 39 U.S.C. § 409(c), "all . . . provisions of title 28 relating to tort claims shall apply to tort claims arising out of activities of the USPS."  Accordingly, the USPS is a federal agency subject to the liability and immunity provisions of the FTCA.  Furthermore, USPS Postal Inspectors are "investigative or law enforcement officers," such that tortious conduct committed by a USPS Postal Inspector avails injured parties of the waiver of sovereign immunity provided by Section 2680(h).  Section 2680(h) defines "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."  28 U.S.C. § 2680(h).  Under 18 U.S.C. § 3061, Postal Inspectors are given the powers to make arrests in certain circumstances and seize property as provided by law.  Since Eyo's complaint arises out of an alleged false arrest by USPS Postal Inspectors, Eyo's claim is

11

proper under Section 2680(h).

Consequently, a claim of false arrest by USPS Postal Inspectors lies within the FTCA and is not barred by Section 2680(h).  The Government's motion for summary judgment on the basis of sovereign immunity will be denied.  However, the Court must examine whether the Annunzio-Wylie Anti-Money Laundering Act provides Defendants with immunity from the claims asserted in this case.

### C. Statutory Immunity Under the Annunzio-Wylie Anti-Money Laundering Act

Congress enacted the Annunzio-Wylie Anti-Money Laundering Act ("the Act") in 1992[5] to combat the flow of illegal activities, particularly money laundering, for which domestic financial institutions are commonly used to manage and transfer funds.  31 U.S.C. § 5311.  To achieve that stated purpose, Congress provides extensive guidelines by which financial institutions must file reports on many common transactions and otherwise encourages financial institutions to voluntarily disclose activities that appear suspicious.  E.g., 31 U.S.C. § 5313 (governing reports on domestic coins and currency transactions); 31 U.S.C. § 5315 (governing reports on foreign

---

[5] The anti-money laundering provisions were later expanded by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the Patriot Act), Pub.L. 107-56, Title III, 115 Stat. 272 (2001).

currency transactions). Congress concurrently provides a "safe harbor" provision to protect financial institutions from liability for making voluntary disclosures of "any possible violation of law or regulation to a government agency." 31 U.S.C. § 5318(g)(3)(A). For the conduct of reporting suspected illegal activities in compliance with the terms of the Act, the safe harbor provision expressly shields financial institutions and their employees from legal liability under any federal, state or local law. Id.

Although the Act and, specifically, the application of its safe harbor provision as an affirmative defense have not yet been addressed by courts of the Third Circuit, the Court is persuaded by the reasoning of various other courts that have agreed that financial institutions should be free to report suspicious transactions in compliance with the Act without fear of civil liability. See, e.g., Lee v. Bankers Trust Co., 166 F.3d 540, 544-45 (2d Cir. 1999) (rejecting a good faith requirement where the plaintiff-employee sued for defamation based upon statements made in a Suspicious Activity Report filed by the defendant bank since no such requirement was present in the plain language of the Act's safe harbor provision); Whitney Nat. Bank v. Karam, 306 F. Supp. 2d 678 (S.D. Tex. 2004) (protecting from discovery disclosures made between the bank and government officials where the bank made voluntary disclosures regarding suspected illegal

13

lending activities in order to encourage financial institutions to report possible criminal violations); Gregory v. Bank One Corp. Inc., 200 F. Supp. 2d 1000 (S.D. Ind. 2002)(immunizing the defendant bank from civil liability where employees negligently and falsely accused plaintiff-employee of stealing funds based upon the clear language of the Act's safe harbor provision); contra Lopez v. First Union Nat'l Bank, 129 F.3d 1186, 1195 (11th Cir. 1997) (finding a good faith requirement in the language of the Act's safe harbor provision even though such a requirement does not appear on its face).

The Act was expressly enacted "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or . . . to protect against international terrorism."  31 U.S.C. § 5311.  To facilitate the enforcement of that directive, the Secretary of the Treasury is granted the power to require any financial institution, including banks, credit unions, insurance companies, or agents thereof "to report suspicious transactions relevant to a possible violation of law or regulation."  31 U.S.C. § 5318(g)(1).  To protect the voluntary disclosures of suspicious activity, the Act provides specified financial institutions a "safe harbor" provision:

> (A) Any financial institution that makes a voluntary disclosure of any possible violation of law or regulation to a government agency or makes a disclosure

14

>     pursuant to this subsection or any other
>     authority, and any director, officer,
>     employee or agent of such institution who
>     makes, or requires another to make such
>     disclosure, shall not be liable to any person
>     under any law or regulation of the United
>     States, any constitution, law, or regulation
>     of any State or political subdivision of any
>     State, or under any contract or other legally
>     enforceable agreement . . . for such
>     disclosure.

31 U.S.C. § 5318(g)(3)(A).

The Act expressly defines the USPS as a "financial institution," such that conduct of the USPS and its employees fall under the immunities from liability provided therein. 31 U.S.C. § 5312(a)(2)(V). Furthermore, the Act explicitly exempts financial institutions such as the USPS acting in compliance with the voluntary reporting provisions from state laws. In this case, Eyo's claims for false arrest and negligent misrepresentation are causes of action that arise under state tort law.

Generally, when the Court finds that statutory language is unambiguous, judicial inquiry is complete, except for "rare and exceptional circumstances" where Congress clearly indicates otherwise. TVA v. Hill, 437 U.S. 153, 187, n. 33 (1978). No such circumstances are present here. Thus, because the Act expressly provides immunity to the USPS from civil liability of the kind asserted in this case when the USPS voluntarily discloses a possible violation of law, the USPS is immune from

15

liability for its alleged conduct in reporting the alleged falsification of the money orders to the local police department.

Eyo contends the statutory immunity provided by the Act is not appropriate in this case because the scope of that protection extends only to counterterrorism and counterintelligence activities.  (Pl.'s Reply, p.8).  Eyo also asserts that there is an implicit qualification that the financial institution that reports a suspected violation of law and the law enforcement agency to which it reports must be independent entities.  (Id.) The Court disagrees with Eyo's assertions regarding both of these issues.  The Act's safe harbor provision specifically exempts from liability "[a]ny financial institution that makes a voluntary disclosure of *any possible violation of law* or regulation *to a government agency*."  31 U.S.C. § 5318(g)(3)(A) (emphasis added).  Such an institution "shall not be liable to any person under . . . any constitution, *law, or regulation of any State* or political subdivision of any State."  Id. (emphasis added).  Contrary to Eyo's claim, the clear and unambiguous language of the Act does not restrict its scope to counterterrorism measures and does not qualify the use of "government agency" to law enforcement agencies that exist independently from financial institutions.  The question of whether a financial institution that conducts the actual arrest in connection with a reported suspicious activity would be

16

similarly shielded from liability is not reached here.

The plain language of the Act provides immunity to the USPS from liability for Eyo's claims under the factual circumstances of this case.  See Gregory, 200 F. Supp. 2d at 1002-03. Irrespective of the ultimate determination that the money orders in Eyo's possession were genuine, the Act provides that the USPS and its employees, as protected financial institutions, may not be held liable for voluntarily notifying law enforcement personnel about suspicions of criminal activity, as Plaintiff alleges they did in this case.

Accordingly, the Court concludes that Eyo can prove no set of facts in support of her claims against the USPS, as a financial institution, that would entitle her to relief for the USPS' uttering of misrepresentations about the money orders or for the USPS' providing of information that led to Plaintiff's arrest and detention for investigation by local police authorities.

Summary judgment is appropriate in this action because no genuine issue of material fact remains to be determined regarding Plaintiff's claims for false arrest and negligence.  Reading all facts and inferences in favor of Plaintiff as this Court must, the Government's motion for summary judgment shall be granted on the basis of the USPS's statutory immunity under the Annunzio-Wylie Anti-Money Laundering Act.

**IV. Conclusion**

    For the foregoing reasons, the Court grants the Government's motion for summary judgment.  The accompanying Order is entered.


**November 29, 2007**            **s/ Jerome B. Simandle**
Date                             JEROME B. SIMANDLE
                                 U.S. District Judge